# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| RONALD E. ROGERS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:09-CV-115-PRC |
| | ) | |
| SEBO'S NURSING AND | ) | |
| REHABILITATION CENTER, LLC, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment [DE 28], filed by Plaintiff Ronald E. Rogers on September 1, 2010. Because genuine issues of material fact exist on elements of Rogers' FMLA claims on which he bears the burden, the motion is denied.

## PROCEDURAL BACKGROUND

On March 17, 2009, Rogers filed his Complaint in the Lake Circuit Court against Sebo's Nursing and Rehabilitation Center ("Sebo's") for alleged violations of the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"). In Count I, Rogers alleges that Sebo's wrongfully and constructively discharged him in violation of the FMLA. In Count II, Rogers claims retaliation in violation of the FMLA, alleging that Sebo's retaliated against him for having requested medical leave for continuing treatment from healthcare providers. In Count III, Rogers asserts state law claims of promissory estoppel and detrimental reliance. Sebo's filed a Notice of Removal on April 24, 2009, and filed an Answer on May 29, 2009, and an Amended Answer on June 16, 2009.

On September 1, 2010, Rogers filed the instant Motion for Summary Judgment and a memorandum in support. On September 29, 2010, Sebo's filed its Response in opposition and a memorandum in support, and on October 18, 2010, Rogers filed a Reply. On October 20, 2010, Rogers filed a Motion to Strike Sebo's Response, and on October 26, 2010, Sebo's filed a Motion

to Strike Rogers' Motion to Strike. On November 9, 2010, the Court granted Sebo's motion, striking Rogers' Motion to Strike as untimely. However, the Court recognized that the evidentiary objections raised by Rogers are considerations the Court makes in the normal course of identifying the admissible evidence on summary judgment.

The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c). The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c). When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with

specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

## MATERIAL FACTS

### A. Rogers' Initial Employment with Sebo's

On December 21, 2006, Sebo's hired Rogers as a full-time Maintenance Director. At that time, Lorraine Batley was Sebo's Administrator and, thus, Rogers' immediate supervisor. On December 21, 2007, Rogers was approved for a 3% annual raise by Lloyd White, the new Administrator, and by Grace Blachly, Sebo's Human Resources Director ("HR Director"). Sebo's Administrator controls the ability to hire and fire the Maintenance Director. Pam Mangiaracina was the Business Office Manager. Frank Marshall worked as Assistant Maintenance Director. During their employment at Sebo's, Rogers and Marshall worked under Administrators Batley and White.

Rogers received his initial orientation from Jim Payton, and there is no indication on the orientation checklist that Payton covered Sebo's' FMLA procedures. Blachly returned to Sebo's as the HR Director after Rogers was hired.[1] Blachly held in-service meetings at Sebo's involving

---

[1] Blachly had previously been the HR Director from 1999-2003.

new forms, but she does not remember having any in-service meetings at Sebo's during the first five months of 2008. Sebo's did not utilize any new FMLA forms during Rogers' employment.

### B. Rogers' Medical Condition

In April 2008, Rogers started having leg problems. Rogers testified that he first received medical care for his ongoing leg condition in April 2008, at which time he says the doctors thought he had a cyst that possibly broke in his leg. On April 16, 2008, Rogers went to the Steel Family Health Care Center complaining of left leg pain for three weeks with the pain starting in the calf. Rogers testified that the doctor believed he had a pulled muscle. When muscle relaxants did not work and he still had bad pain, Rogers went to the St. Mary Medical Center emergency room on May 12, 2008. He complained of left leg pain, describing pain behind the left knee, numbness of the foot off and on, and pain that radiated up to the hip and down to the ankle. Testing found no blood clots in his leg.

On May 16, 2010, Dr. Mark Ritter of Steel Family Health Center examined Rogers, who complained of low back pain extending into the left leg for a couple of months and reported that he had been using a lot of over-the-counter medications and that he had gone to the emergency room the previous Tuesday. He also indicated that he needed a note for work. The prognosis indicated that Dr. Ritter was "going to obtain an x-ray of the LS spine. EMG of the left leg. If, in fact, when he comes back nothing is noted, MRI of the LS spine and also the left leg will be obtained." Pl. Br., Exh. H, p. 19.

On May 21, 2008, the EMG conclusion provided: "findings suggest a moderately severe left L5 radiculitis. Herniated disc at the L5-S1 intervertebral space should be considered. MRI of lumbosacral spine would be very helpful." Pl. Br., Exh. H, p. 11. On May 23, 2008, Rogers went

to a follow up visit at the Steel Family Health Care Center for the EMG results. On May 28, 2008, the impression following an MRI of the lumbar spine was "large broad based left posterolateral disc extrusion at L4-L5 producing neural impingement and left foraminal stenosis" and "bilateral disc-osteophyte complexes at L5-S1 more prominent on the right producing right foraminal stenosis and neural impingement." Pl. Br., Exh. H., p. 8. At some point, Rogers began suffering severe pain in the sciatic nerve.

The medical records show that Rogers received pain medications and muscle relaxers on April 16, May 12, May 16, and May 23, 2008.

Rogers had back surgery on July 17, 2008. Rogers had an MRI on August 18, 2008, and was given an order for physical therapy on September 3, 2008. He was also referred for pain management on September 3, 2008, with visits on October 8, 2008, October 13, 2008, October 27, 2008, and October 29, 2008.

### C. Sebo's Leave Policy and Administration of the Policy

Sebo's maintained a company handbook for employees that included a leave of absence policy as well as a leave policy under the FMLA. Rogers received a copy of the company handbook from Sebo's, and he read the handbook. The written FMLA policy in the handbook provides, in relevant part: "If you take leave because of your own serious health condition, you must provide a medical certification that you are fit to resume work or that you can perform essential functions of your job with reasonable accommodation." Pl. Br., Exh. J., p. 2. The reinstatement policy provides, in relevant part: "The Company will restore an employee who takes FMLA leave to the same or an equivalent position and benefits upon return to work." Pl. Br., Exh. N.

During the relevant time period, Sebo's' FMLA forms included the "Employee Request for Leave of Absence" form, the "Employer Response to Employee's Request for Family or Medical Leave" form, and the "Certification of Health Care Provider" form. The "Employee Request for Leave of Absence" form provides: "Documentation supporting a request for leave of absence is required. Any request for a leave of absence that is not supported with proper documentation will not be processed." Pl. Br., Exh. K., p. 1.

The company policy on leaves of absence was communicated through in-services at Sebo's conducted by Human Resources. Blachly testified that Sebo's maintained a policy, also set forth in the handbook, that any employee absent for three or more days may be required to bring in a note from a doctor. Rogers understood that for an absence from work of three or more days, he needed documentation verifying his absence. If an employee's absence is recurring, Blachly testified that she asks the employee what is wrong, the reason for the absence, and whether the employee has spoken to his or her supervisor regarding the absence. As HR Director, when Blachly becomes aware of a recurring absence due to a serious health condition, she provides the employee with FMLA paperwork, including paperwork for the treating physician to complete.

If a Sebo's employee has vacation or sick time benefits accrued, they can get paid during medical leave. For an absence to be excused, the employee must provide documentation, either by bringing it in or by sending it by fax. Blachly testified that, most of the time, when an employee goes to the doctor, a notice is faxed from the doctor's office documenting that the employee is ill that day or why the employee has been away if it is more than one day. According to Blachly, an employee does not need to advise her directly of an absence but rather should tell the supervisor about the sickness and the need to go to the doctor. The supervisor would tell Blachly, who would

then provide the FMLA paperwork. Blachly testified that employees other than Frank Marshall, who is discussed below, took qualifying FMLA leave after she returned to Sebo's as its HR Director in January 2008. When processing employee leaves of absence under the FMLA, Blachly may have at times received the certification from the treating physician after a leave had commenced, but she has not received certifications signed by the treating physician after an employee has already returned to work. She receives the completed FMLA paperwork before employees return to work.

Sebo's maintained a poster advising employees of their FMLA rights mounted near the employee time clock, which was located near Blachly's office. In order for Rogers to reach his Maintenance Director's office from the inside of the building, he would have to pass by Blachly's office, the time clock, and the bulletin board with the notice.

In an Affidavit, White–the Administrator and Rogers' supervisor–averred that at no time while Administrator at Sebo's did he orally or in writing allow employees to fail or refuse to follow Sebo's employment policies and practices or federal law encompassing employment practices.

### D. Rogers' Communications with Sebo's in April and May 2008 and his Termination

Sebo's' Human Resources records contain relevant absence reports for Rogers in 2008 for April 7 (reported to White; "hurt his back"), April 16 (reported to White), May 5 (reported to Mangiaracina; "says his leg hurts"), May 6 (reported to Frank Marshall and filled out by Mangiaracina; "leg hurts"), May 12 and May 13 (reported to White; "called off late. was not a two hour notice before his shift. per Lloyd."), May 14 (reported to Mangiaracina; "leg still hurts," "could not find Lloyd's no."), May 15 (reported to Mangiaracina; "leg still hurts, medicine not working well yet"), May 16 (reported to Mangiaracina; "still legs hurt, going to doctors"), May 19 (reported to White), and May 21 (reported to Mangiaracina; "will not be in the rest of the week"). Rogers

testified that there is no absence report for the date that he called the nurses station. Blachly was responsible for employees' files.

During May 2008, Rogers was off from work from the 2nd to the 28th. Rogers testified that, once he was off from work in May, he did not come back, but that he was "keeping in touch" by calling White or the office. Pl. Br., Exh. A, p. 22. Rogers testified that, numerous times he called either White's cell phone, Sebo's' office, or the nurses' station in one instance when White was unavailable. Rogers called White because White was his immediate supervisor. However, Mangiaracina would take messages when White was not available. Any absence reports prepared by Mangiaracina and White were placed in Blachly's mailbox. Rogers testified that he complained to White about "pain" and that he had talked to White at work about leg pain. Rogers testified that White told him to get well, directed him to submit paperwork when Rogers was ready to return to work, and did not ask Rogers for a date of return. However, in his Affidavit, White avers that he did not tell Rogers that he could provide Sebo's with documentation from health care providers when (or if) the health care problem was found or when (or if) he could return to work from Sebo's. White also states that he never told Blachly that Rogers could turn in requested documentation at a later date after it was determined that Rogers could return to work.

Blachly testified that White tried to reach Rogers by telephone on a number of occasions but that Rogers would never return the phone calls. Blachly testified that the only time Rogers called her by telephone was in regard to his paycheck and using his accrued vacation days to receive pay while on leave. When Rogers called her on May 12 about picking up his check on May 16, Blachly asked him to bring in documentation substantiating his absences. On May 16, 2008, Rogers drove his motorcycle to Sebo's to pick up his paycheck from Blachly. At that time, Blachly inquired about

Rogers' medical condition, asking him how he was doing, what was going on with him, whether he had been to a doctor, and for documentation. Rogers did not submit medical certification to Blachly at that time because he was not fit to resume work. However, Rogers informed Blachly that he was keeping in touch with White. On May 26, 2008, Rogers again spoke with Blachly about his paycheck ahead of the May 30, 2008 pay date, and Blachly again asked him to bring in documentation from his doctor.

In her deposition, Blachly states that she did not know anything about Rogers' health condition as of either May 16, 2008, or May 30, 2008, but that she was aware that Rogers had reported that his leg hurt based on the May 16, 2008 absence report. Blachly testified that she was not aware that Rogers' recurring absences were due to a serious health condition, and she did not send him FMLA paperwork. She stated that Rogers was unresponsive to her questions, "very evasive," and never indicated that he had any illness or health issues when she spoke with him. Def. Br., Exh. B, p. 32. When Blachly requested documentation, Rogers responded that the paperwork was at home and that he would bring it in. Blachly testified that, during their conversations, Rogers did not say anything to her about his leg, that he had been in communication with White, or that White had told Rogers he could bring in his documentation upon his return to work. Blachly testified that Rogers did not have to give the reason for his absence to her, but that Sebo's' policy states that any call-offs have to be made to the immediate supervisor. Blachly testified that White never talked to Human Resources about Rogers' health condition. Blachly testified that she knew nothing of the extent of Rogers' health condition before his termination and that she never became aware that he might need leave under the company's policies.

Rogers testified that, during his absence, White never gave Rogers the impression that his job was in jeopardy nor asked Rogers to fill out a leave of absence form. Rogers testified that no one from Sebo's contacted him during April or May 2008 to let him know that he needed to fill out any leave of absence form. Sebo's never gave Rogers a form to request FMLA leave during April or May 2008. During May 2008, Rogers never asked Blachly for a leave of absence. White testified that Rogers also never asked him for any time away from work due to a medical or health issue and never asked him for any time away from work under Sebo's' employment policies and practices or under the FMLA.

White avers that, in late May 2008, Rogers telephoned him to discuss his employment and that, during that conversation, White told Rogers to come to the facility on the morning of May 28, 2008, to meet with White. However, Rogers did not appear. Afterwards, White contacted Rogers by telephone and informed him that his employment was terminated effective immediately because he had failed to come to the meeting.

In contrast, Rogers testified that, on May 28, 2008, the day Rogers had his MRI results, White called and left a message for Rogers. That same day, Rogers learned that he could return to work and returned White's call around noon to inform him that he could return to work the next day. White told Rogers that he wanted to talk to him before he came back and told him to bring his paperwork. Rogers remembers that White told him to come in at 2:00 p.m., which Rogers understood to mean at 2:00 p.m. the following day. Rogers called White on May 29 prior to 2:00 p.m. and told White that he had his paperwork for his return. Rogers testified that White informed him at that time that he had fired him the day before since he had not shown up at 2:00 p.m. the day before and said that he did not need Rogers any more.

Rogers expected to return to work as Maintenance Director on May 29, 2008, and believed that he could have done the job because he had an assistant. However, his employment was terminated on May 29, 2008, by White. White indicated the reason for Rogers' termination by circling, on page 21 of the company handbook, the second bullet point of the section entitled "Additional Attendance Guidelines" which provides: "A doctor's note of verification that employee is free of communicable diseases may be required when absent for more than three (3) days due to illness." Pl. Br., Exh. E, p. 22. After learning of the termination on May 29, Blachly created a memorandum concerning Rogers' absences that same day. She prepared the memorandum to list the items that needed to be returned by Rogers to Sebo's and to recite accurately her attempts to secure verifying documentation from Rogers concerning his absences.

Rogers' final paycheck was handed to him by White from the back door of Rogers' former office at the back of the building on May 30, 2008. Rogers never received a separation notice from Sebo's. Sebo's replaced Rogers as Maintenance Director with Dale Slosser, who worked in that position from June 18, 2008, through April 24, 2009. Steve Costa is currently the Maintenance Director at Sebo's.

Blachly and White received documentation from Rogers for the first time in October 2008 during Rogers' unemployment hearing.

### E. Frank Marshall

Frank Marshall started work at Sebo's in approximately December 2002, working continuously until his layoff in 2010. Rogers was his immediate supervisor. Prior to 2009, Marshall did not fill out any FMLA forms for any of his medical leaves of absence. Rogers remembers generally that, while under his direct supervision, Marshall took a few weeks off for medical

conditions. When Marshall was off from work, he reported his absence to the office and not to Rogers. Marshall testified that, when he was sick or taken to the hospital and did not know how long he would be off work, he was only required by Human Resources and his supervisor to provide a doctor's statement providing that he could come back to work.

From December 29, 2006, through January 8, 2007, when Sebo's' Administrator was either Batley or White, Marshall was under doctor's care and off work for about 10 consecutive days. Marshall obtained his doctor's statement to return to work after he got out of the hospital during a follow up visit. Marshall understood that, to return to work, he had to present his doctor's note to Human Resources and his supervisor. Marshall did not fill out any FMLA papers for his medical leave.

From December 26, 2005, through January 18, 2006, Marshall was off work and under a doctor's care for a health reason. During this leave, the Administrator was either White or Batley, and Marshall did not fill out any FMLA paperwork. While on leave Marshall called Sebo's to let them know what he was doing, and he returned to work by obtaining a doctor's note and presenting it to Human Resources. Marshall followed a similar procedure for medical leaves from June 12 to June 23, 2003; September 3 to September 28, 2003; December 5 to December 11, 2005; and January 28 to February 10, 2008.

Marshall testified that, if he could not speak with his supervisor when he called off work, he would talk with the front office or Human Resources, let them know what was going on, and fax over his documents. For the absences from 2003 through 2008, no one from Sebo's told Marshall that he needed to fill out a leave request if he was going to be off from work for a length of time. For each of those health-related absences, Marshall did not have any problem returning to his job.

13

In February 2009, Marshall was diagnosed with colon cancer. Prior to this diagnosis, Marshall had never taken a "leave of absence" from his employment with Sebo's. Blachly knew of Marshall's diagnosis because he told her about it. He also told her that he would need to take a leave of absence and asked her for the leave of absence and FMLA forms. According to the leave of absence documents, the documentation required for leave was reviewed with Marshall on February 11, 2009, prior to his FMLA-approved leave that was to begin on February 16, 2009. Marshall signed the Certification of Health Care Provider on February 13, 2009.

## ANALYSIS

Plaintiff Ronald E Rogers seeks partial summary judgment in his favor, asking the Court to find as a matter of law that Sebo's directly interfered with Rogers' substantive FMLA rights, that Rogers is entitled to liquidated damages on his substantive FMLA interference claims, and that Sebo's' reason for terminating his employment is a pretext for retaliation in violation of the FMLA and to limit the jury trial to the issue of damages only. Rogers contends that he requested medical leave from White, the Administrator, putting Sebo's on notice of his need for medical leave but that Sebo's subsequently failed in its duties to him by never requesting a medical certification to support Rogers' request for medical leave, never taking any steps to investigate Rogers' need for FMLA leave, and not determining if Rogers' absences in May 2008 were FMLA qualifying. Rogers further claims that Sebo's terminated his employment in retaliation for having exercised his rights under the FMLA. Because there are genuine issues of material fact for the jury as to whether Rogers provided Sebo's with sufficient notice of his leave–an element of Rogers' interference claim on which he carries the burden of proof, and as to whether Rogers engaged in protected activity–an

element of Rogers' retaliation claim on which he carries the burden of proof, summary judgment is inappropriate.

## A. Interference with FMLA Rights

The Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* permits eligible employees to take twelve workweeks of leave within a twelve-month period if they are unable to perform their job function as a result of a serious health condition. 29 U.S.C. § 2612(a)(1)(D). In furtherance of these rights, the FMLA provides that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." *Id.* at 2615(a)(1). Thus, the FMLA contemplates the interference theory of recovery asserted by Rogers in this case. *Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (citing *Hoge v. Honda Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). An employer who violates § 2615 is "liable to any eligible employee affected" for compensatory damages and "for such equitable relief as may be appropriate, including employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1).

To prevail on a claim of interference with FMLA rights, a plaintiff must demonstrate that "(1) [he] was eligible for FMLA protection; (2) [his] employer was covered by the FMLA; (3) [he] was entitled to FMLA leave; (4) [he] provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied him benefits to which he was entitled." *Brown v. Auto. Components Holdings, LLC*, 622 F.3d 685, 689 (7th Cir. 2010) (citing *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009)). The plaintiff need not prove ill intent on the part of the employer. *Burnett*, 472 F.3d at 477; *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999) (recognizing that "[t]he intent of the employer is immaterial" for an interference claim).

It is undisputed that Rogers, having been employed more than twelve months and having worked more than 1250 hours during the twelve-month period preceding the needed leave, was eligible for FMLA protection, and it is undisputed that Sebo's is an employer as that term is defined by the FMLA. However, there are disputed facts regarding whether Rogers was "entitled to take leave" under the third prong on the question of whether he could perform the essential functions of his Maintenance Director position. Moreover, viewing the facts in the light most favorable to Sebo's, as the Court must do on summary judgment, there is a genuine issue of material fact as to whether Rogers provided Sebo's with sufficient notice of his intent to take leave.

*1. Entitled to Take Leave*

The third element a plaintiff must prove to prevail on an FMLA interference claim is that he is entitled to take leave under the FMLA. To qualify for FMLA leave, an employee must show both that (1) he suffers from a "serious health condition," as defined under 29 C.F.R. § 825.113, and (2) he "is unable to perform the functions of the position of the employee," as defined under 29 C.F.R. §825.115. *See Burnett*, 472 F.3d at 477-78 (citing 29 U.S.C. § 2612(a)(1)(D)).

A "serious health condition" within the meaning of the FMLA is defined as "an illness, injury, impairment, or physical or mental condition that involves . . . (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); *see also* 29 C.F.R. § 825.113(a). The term "treatment" for purposes of paragraph (a) "includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.113(c). Section 825.115 defines continuing treatment:

A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>
> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.
>
> (3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.
>
> . . . .

29 C.F.R. § 825.115(a). Rogers contends, and Sebo's does not contest, that Rogers suffered from a "serious health condition" in May 2008 because he was taking regular pain medications for his leg and back pain, his health care providers kept him from working while they investigated his health problems, he visited his health care providers numerous times, and he received several examinations and tests, including x-rays, an EMG, and an MRI, which ultimately determined that he suffered from herniated discs and complex osteophytes at levels L4-L5 and L5-S1.

However, Sebo's does dispute Rogers' claim that he could not perform the various essential job functions of his position as Maintenance Director. *See Burnett*, 472 F.3d at 478 (recognizing that an employee is deemed unable to perform the functions of his position when he is "unable to perform any one of the essential functions of [his] position"). Rogers reasons that while he was off from work from May 2 to May 28, 2008, he suffered severe and constant leg pains and spasms that were exacerbated by walking. An essential function of his job as Maintenance Director was continuous walking, which Rogers states he could not do, along with being unable to lift heavy weights. However, Sebo's counters that these arguments are not supported by Roger' own deposition testimony. Rogers testified in response to a question about being physically able to return

to work that "I could have done my job at Sebo's. I had a helper. We helped each other. So it wasn't just me having to do it, it was two of us, so I had a helper." Pl. Br., Exh. 1, p. 59-60. Thus, there are questions of fact regarding whether Rogers could perform the essential functions of his position generally over the course of the month of May 2008.

Rogers also argues that he was unable to perform the essential functions of his job during the five times he sought treatment from a health care provider during that time period. " An employee who must be absent from work to receive medical treatment for a serious health condition is considered to be unable to perform the essential functions of the position during the absence for treatment." 29 C.F.R. § 825.123(a). Although Rogers may have been deemed "unable to perform the essential functions of his position" during the absences for those specific periods of treatment, this regulation does not inform whether he was able to perform the essential functions of his Maintenance Director position for the intervening days. Thus, there are questions of fact on this element of whether Rogers was entitled to take leave.

*2. Notice Requirement*

The fourth element of a plaintiff's burden of proving interference with FMLA rights requires that the plaintiff demonstrate that he provided sufficient notice of his intent to take leave. "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case. It generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable

to such leave." 29 C.F.R. § 825.303(a).[2]  "When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances."  *Id.* at § 825.303(c).

When giving notice, "[a]n employee need not expressly mention the FMLA in his leave request or otherwise invoke any of its provisions."  *Burnett*, 472 F.3d at 478 (citing *Phillips v. Quebecor World RAI, Inc.*, 450 F.3d 308, 311 (7th Cir. 2006) (citing 29 C.F.R. § 825.303(b)).  It is enough if the employee "provides information sufficient to show that he *likely* has an FMLA-qualifying condition."  *Id.* at 479 (citing *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 953 (7th Cir. 2004); *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001)).  Put differently, "[t]he employee's duty is merely to place the employer on notice of a probable basis for FMLA leave. He doesn't have to write a brief demonstrating a legal entitlement. He just has to give the employer enough information to establish probable cause, as it were, to believe that he is entitled to FMLA leave."  *Stevenson v. Hyre Electric Co.*, 505 F.3d 720, 724-25 (7th Cir. 2007) (quoting *Aubuchon*, 359 F.3d at 953).  Once the notice is given, it then becomes "the employer's duty to request such additional information from the employee's doctor or some other reputable source as may be necessary to confirm the employee's entitlement." *Id.* at 725 (same).

The Seventh Circuit Court of Appeals has held that "in the usual case, an employee's bare assertion that he is 'sick' is insufficient."  *Burnett*, 472 F.3d at 479 (citing *Phillips*, 450 F.3d at 312; *Collins*, 272 F.3d at 1008).  "Simply put, an employee's reference to being 'sick' . . . does not suggest to the employer that the medical condition might be serious or that the FMLA otherwise

---

[2]  In contrast, when leave is foreseeable, 29 C.F.R. § 825.302(a) requires that notice be given at least 30 days in advance.  "[A]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."  29 C.F.R. § 825.302(c).

could be applicable." *Id.* (*quoting Phillips*, 450 F.3d at 312 (*quoting Collins*, 272 F.3d at 1009)) (quotation marks omitted). Nor does merely demanding time off from work satisfy the notice requirement; the employee must give the employer "a reason to believe that he's entitled to it." *Aubuchon*, 359 F.3d at 952. "[I]f you have brain cancer but just tell your employer that you have a headache, you have not given the notice that the Act requires." *Id.*

Rogers argues generally that Sebo's knew of his continuing leg and back pain and of his medical treatment to determine the cause of his pain and that "HR Director Blachly knew Rogers was absent for leg and back pain for which he was seeking medical treatment, but did nothing further to determine if Rogers qualified for FMLA leave." Pl. Br., p. 19. He contends that he requested medical leave from White, thereby putting Sebo's on notice of his need for FMLA leave. Rogers believes that he provided Sebo's with enough information to investigate and determine if his need for leave in May 2008 qualified for FMLA leave because he followed established and accepted Sebo's practice and procedure for requesting medical leave of absence. He points to the absence reports created by Sebo's and maintained in his file to argue that Sebo's had more than enough information to determine Rogers' need for FMLA leave. He also contends that copies of these absence reports were furnished to Sebo's' HR Director Blachly. From communications with White and Blachly, Rogers believes he was led to understand that he only needed a doctor's certification when he was ready to return to work from medical leave.

Rogers contends that he followed Sebo's policies because he "kept in touch" with White, that Sebo's made no efforts to engage Rogers concerning his FMLA leave, that he used "Sebo's customary notice and procedure, as relayed to him by Administrator White, for requesting medical leave," that Sebo's never requested that his leave of absence be supported by medical certification

except upon return to work, and that he was never told that his job was in jeopardy if he did not provide medical certification to support his request for medical leave. *See* 29 U.S.C. § 2613(a) (establishing that an employer may require that an FMLA request be supported by a certification from a health care provider); 29 C.F.R. § 825.305(d) ("At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification.").

However, Sebo's responds that Rogers did not provide sufficient notice to put Sebo's on notice that he may be requesting leave under the FMLA. Sebo's recognizes that Rogers called in absent from work several times during the months of April and May 2008. As a result, absence reports were generated for those days based upon the information provided by Rogers. On April 7, 2008, Rogers gave the reason for his absence that he "hurt his back." On April 16, 2008, no reason was provided. For both of those dates, the "sickness-self" box on the absence form was checked. In May 2008, Rogers called in absent and gave the following reasons for his absences: May 5 - "says his leg hurts;" May 6 - "leg hurts;" May 12/13 - no reason given, "sickness-self" box was checked, White noted "Called off late. Was not a two hour notice before his shift. Per Lloyd."; May 14 - "leg still hurts," "could not find Lloyd's number;" May 15 - "leg still hurts; medicine not working well yet;" May 16 - "leg still hurts; going to doctors;" May 19 - no reason given; May 21 - "will not be in the rest of the week." Any inference from the lack of a written reason for the absence is drawn in favor of nonmovant Sebo's, namely that no reason was given by Rogers.

The most that can be determined from the April absence reports is that Rogers hurt his back, but, given that he was only off for one day in April for his back, it is not clear that Sebo's had notice of a severe medical condition related to Rogers' back. As for Rogers' communications in May,

Sebo's was aware in the first half of the month only that Rogers' leg hurt. Rogers' nonspecific references that his "leg hurts" and "medicine not working well," comparable to generic statements that an employee is "sick," do not necessarily suggest that Rogers had a serious medical condition or that the FMLA might apply to his situation. There is no indication to Sebo's that Rogers intended to see a doctor until May 16, and neither of the subsequent reports on May 19 and 21 mention him having gone to the doctor. The final absence report of May 21 provides no explanation for his absence and only contemplates Rogers being out for the remainder of the week, leaving Sebo's with the reasonable inference that he would be returning to work the following week. There is no mention in the May 21 absence report of Rogers being under the care of a physician or of the nature of his medical condition. On the evidence before the Court, Rogers has not shown as a matter of law that Sebo's was aware that he was "seeking medical attention" for his claimed ailments. Although Rogers argues that the medical evidence shows that his medical condition caused him to seek treatment at least five times by a health care provider between May 2 and May 28 and that he received pain medications and muscle relaxants on four occasions, there is no evidence that Sebo's was on notice or aware of these visits or prescription medications. Rogers has not established as a matter of law that he did more than simply communicate the equivalent of "I'm sick".

In addition, Sebo's' employees maintain that Rogers refused to return their phone calls, was evasive when questioned by Blachly about his absences, and consistently refused to provide Sebo's with any substantiating documentation. Rogers' statements that he told White about his alleged health issues are in direct contravention with Blachly's testimony of the events that occurred in May 2008 and of White's statements in his Affidavit. Blachly asked Rogers for documentation on May 12, 16, and 26, yet Rogers did not provide any. If Rogers had been in communication with White

about his absences during May, Rogers could have told Blachly on any of these occasions when she made her requests; yet Blachly testified that Rogers did not so inform her. Blachly describes Rogers as unresponsive and evasive and testified that he never indicated that he had any illness or health issues when she spoke with him. White never told Blachly about any arrangement with Rogers to allow him to bring in his documentation upon Rogers' return to work, and White denies that he ever made any such arrangement with Rogers.

Rogers' actions also suggested to Sebo's that no serious medical condition existed and, thus, that no medical leave was needed. Rogers called Blachly on May 12 and May 26, ahead of paychecks being issued on May 16 and May 30 respectively, to ask about vacation and sick days and to make sure those were accounted for on his upcoming paychecks, yet he did not provide her with any information to put her on notice of a serious medical condition. Although an employee may receive compensation while on FMLA leave through the use of either sick or vacation leave, *Hendricks v. Compass Group, USA, Inc.*, 496 F.3d 803, 805 (7th Cir. 2007) (citing 29 U.S.C. § 2612(d)(2)), Sebo's suggests that Rogers' actions are not necessarily representative of the kind of behavior of someone who requested leave, needs leave, or of someone with a serious medical condition. In addition, on May 16, Rogers rode his motorcycle to Sebo's to pick up his paycheck rather than ask for the check to be mailed to him, have someone else pick up the check, or have someone else drive him to get the check. Finally, Rogers did not provide any documentation to Sebo's regarding his medical condition prior to his termination despite Blachly's request that he do so.

Rogers also argues that he followed what he believed was Sebo's' established and accepted pattern and practice to obtain FMLA leave based on his observations of Frank Marshall's absences

for medical reasons. Rogers claims that Sebo's established a pattern and practice of not requiring medical certification to support a request for FMLA leave when Marshall was not required to fill out any paperwork for any of the six periods of time prior to 2008 that Marshall was absent from work for medical reasons. Although Rogers describes these absences as "FMLA leave," it is not clear from the record which, if any, may have qualified as FMLA leave. The 2008 Attendance Calendar for Marshall shows notations of "EX," which Blachly testified means that the employee has provided documentation in support of an absence, which is usually sent by fax from the doctor. However, there are no notations on the 2008 calendar of "FM," which is identified by the "absence codes" at the top of the calendar to mean "Family-Medical Leave." Attendance Calendars for Marshall for prior years are not in the record. Moreover, Marshall testified, "I never had to take a leave of absence until I got the cancer."[3] Although Rogers had an impression of how Marshall's absences were handled based on his observations, Marshall testified that he spoke to Human Resources or the front office and "fax[ed] my stuff over to them" and "did everything by the book." Def. Br., Exh. C, p. 21, 24. Finally, it is not clear how many of Marshall's six absences Rogers was aware of prior to May 2008 as opposed to through the course of discovery.

In addition, Sebo's responds that Rogers did not adhere to Sebo's' policies and was terminated from his at-will employment as Maintenance Director. There is no dispute that Sebo's maintained a company handbook containing leave policies and attendance guidelines or that Rogers received a copy of the handbook and read it. One of the policies, the one invoked by White on Rogers' Resignation/Discharge Form, provided that Sebo's may require a doctor's note to verify that

---

[3] Whether Marshall followed Sebo's FMLA procedures in February 2009, nine months after Rogers was terminated, is irrelevant because it does not inform what Rogers knew about how Sebo's processed FMLA leave during the time period at issue.

an employee is free from communicable diseases for an absence lasting more than three days. Rogers never requested leave from Sebo's, yet other employees took FMLA-qualifying leave after Blachly returned to Sebo's in January 2008.

Rogers makes several efforts to prove that he was not aware of the written policies. For example, although Rogers argues that Sebo's failed to properly instruct him on its FMLA policies because his initial orientation did not cover Sebo's FMLA procedures and because Blachly did not hold any in-service meetings upon her return in the first months of 2008, Rogers never offers any testimony that he was not in fact aware of Sebo's written FMLA policies. As another example, Rogers notes that his office had an exterior door to the outside of the building and, thus, that it was not necessary for Rogers to walk past Blachly's office where the FMLA notices were posted next to the time clock in order to enter his own office and work area at Sebo's. Yet, there is no statement from Rogers that he did *not* in fact walk by Blachly's office, that he was not aware of the postings, or that he was not aware of the official FMLA policy in the handbook.

The disputed issues of material fact related to Rogers' communications and actions, viewed in the light most favorable to Sebo's, suggests that Rogers withheld important information which may have misled Sebo's because there was no suggestion that a serious medical condition existed. *See, e.g., Stevenson*, 505 F.3d at 725.[4]  Rogers has not demonstrated that, as a matter of law, his statements of back and leg pain were sufficient to put Sebo's on notice that he has a serious medical condition or to trigger FMLA or any type of leave. As is apparent from the disputed evidence before the Court, the "adequacy of notice is a fact-rich question [that] is perhaps best resolved by the trier

---

[4] Although a plaintiff may instead demonstrate that he gave constructive notice of a serious health condition under the FMLA by either the employee's inability to communicate his illness to his employer or clear abnormalities in the employee's behavior, *see Byrne v. Avon Prods.*, 328 F.3d 379, 381-82 (7th Cir. 2003), Rogers does not assert constructive notice and the facts before the Court do not appear to support such a finding.

of fact, particularly, where, as is the case here, the employer and employee dispute the quantity and nature of communications regarding the employee's illness." *Burnett*, 472 F.3d at 479. Because Rogers cannot establish as a matter of law that he provided the requisite notice to Sebo's, the Court does not go on to consider whether Sebo's failed in its duty to investigate and inquire into his need for FMLA leave.

*3. Liquidated Damages*

The FMLA provides: "Any employer who violates section 2615 of this title shall be liable to any eligible employee affected–. . . for damages equal to . . . an additional amount as liquidated damages equal to the sum of the amount" of lost wages plus interest." 29 U.S.C. § 2617(a)(1). To avoid paying liquidated damages, an employer must prove that the discriminatory actions were taken "in good faith and that the employer had reasonable grounds for believing that the act or omission" did not violate the FMLA. *Id.* Because there has not been a finding that Sebo's violated § 2615, any consideration of liquidated damages under § 2617 is premature.

## B. Retaliation in Violation of the FMLA—Pretext

In Part D of his Argument, Rogers contends that the Court should find that Sebo's' reasons for terminating him rise to the level of pretext. Rogers advances the "pretext" argument in the context of his retaliation claim, arguing that *"trial"*[5] is warranted "[i]f the record contains evidence that, if believed, could allow a reasonable jury to conclude that the employer *retaliated* against the employee for exercising his rights under the FMLA, coupled with suspicious timing of the employer's termination of the employee." Pl. Br., p. 24 (emphasis added) (citing *King*, 166 F.3d at 893 (applying the *McDonnell Douglas* burden-shifting analysis to finding that the plaintiff had

_____

[5] By his own words, Rogers appears to argue that this issue should go to the jury.

made out a prima facie case of FMLA retaliation claim with indirect evidence and that the plaintiff

had met his burden of demonstrating pretext because there were factual assertions that could allow

a reasonable trier of fact to conclude that the employer had retaliated against the employee for taking

FMLA leave)).[6]

The FMLA makes it unlawful to "discharge or in any other manner discriminate against any

individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).

Specifically, an employer is prohibited "from discriminating or retaliating against an employee or

prospective employee for having exercised or attempted to exercise FMLA rights."  29 C.F.R. §

825.220(c); *see also Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884-85 (7th Cir. 2005)

(recognizing that an employer cannot retaliate against an employee for taking FMLA leave).

Moreover, "employers cannot use the taking of FMLA leave as a negative factor in employment

actions, such as hiring, promotions or disciplinary actions."  29 C.F.R. § 825.220(c).

The Seventh Circuit Court of Appeals has held that an FMLA retaliation claim can proceed

under either the direct or indirect methods of proof.  *See Ridings v. Riverside Med. Ctr.*, 537 F.3d

755, 771 (7th Cir. 2008).   In the absence of direct evidence of discrimination, the *McDonnell

Douglas* burden-shifting framework applies to claims supported with indirect evidence.  *See King*,

166 F.3d at 893.   Under this framework, a plaintiff must first make out a prima facie case of

discrimination by demonstrating that "(1) he engaged in statutorily protected activity; (2) he met his

employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was

treated less favorably than similarly situated employees who did not engage in statutorily protected

---

[6] "A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory; the difference is that the first type of claim requires proof of discriminatory or retaliatory intent while the latter requires only proof that the employer denied the employee his or her entitlements under the Act."  *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884-85 (7th Cir. 2005).

activity." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 634-35 (7th Cir. 2009).[7] If the plaintiff is successful, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id*. at 635. The burden then shifts back to the plaintiff to show that the reasons "are false and only a pretext for discrimination." *Id*.

As with his interference claim, Rogers' pretext argument in support of his retaliation claim assume the foundational issue that he engaged in protected activity, illustrated by his assertion that he "requested medical leave from Administrator White." Pl. Br., p. 24. However, as set forth at length above, genuine issues of material fact exist for the jury as to whether Rogers gave Sebo's sufficient notice of his intent to take medical leave under the FMLA, and thus whether he engaged in protected activity. If this matter were before the Court on a defense motion for summary judgment, the Court would consider whether Rogers could survive that motion by engaging in the burden-shifting analysis, *see Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Burnett*, 472 F.3d at 481; however, because this matter is before the Court on a *plaintiff's* motion for summary judgment on liability, Rogers bears the burden of proving his case, not merely surviving by demonstrating a genuine issue of material fact for trial. If Rogers never exercised his FMLA rights in the first instance, then his claim of retaliation is problematic at best. If the jury finds that Rogers did engage in protected activity, then the question of whether Sebo's' explanation for Rogers' termination is pretextual may inform the jury's ultimate finding of whether Rogers was fired in retaliation for engaging in that protected activity. *Reeves v. Sanderson Plumbing Prods.,*

---

[7] The Seventh Circuit has also articulated the prima facie case as requiring the plaintiff to demonstrate that "(1) he engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) there is a causal link between the employee's protected activity and the adverse action." *King*, 166 F.3d at 892. To demonstrate a "causal link," the employee must show that the employer would not have taken the adverse action but for the employee's protected activity. *Id*.

*Inc.*, 530 U.S. 133, 147 (2000) (recognizing its reasoning that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation"). In light of the genuine issues of material fact that remain for trial, summary judgment in Rogers' favor on his retaliation claim under a pretext analysis is inappropriate.

## CONCLUSION

Finding that genuine issues of material fact preclude summary judgment, the Court hereby **DENIES** Plaintiff's Motion for Partial Summary Judgment [DE 28].

SO ORDERED this 7th day of December, 2010.

     s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record